**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS L. DAY, JR.** | : | |
| | : | **CIVIL ACTION NO. 1:CV-04-1040** |
| **Plaintiff** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **BOROUGH OF CARLISLE, et al.** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion For Summary Judgment.  (Doc. No. 30.)  The

motion has been fully briefed and is ripe for disposition.  For the reasons discussed below, the

motion will be granted.

**I.     Background**[1]

Plaintiff Thomas Day brings this action under 42 U.S.C. § 1983 alleging that the Borough

of Carlisle ("Carlisle") terminated his employment from the Carlisle Police Department ("Police

Department") because of his participation in union activities, in violation of his right to free

speech and freedom of association under the First Amendment, and his right to procedural and

substantive due process under the Fourteenth Amendment.  (Doc. No. 1.)  Plaintiff also asserts a

pendent state law claim for defamation.  (Doc. Nos. 1, 6.)  Plaintiff brings these claims against

the Borough of Carlisle, Carlisle Mayor Kirk Wilson, Carlisle Borough Manager Fred Bean,

Chief of Police Stephen Margeson, Lt. Barry Walters, and Sgt. Douglas Pfahl, in both their

official and individual capacities.  (Id.)

---

[1]  In this section, the Court presented and viewed the evidence in a light favorable to non-
moving Plaintiff.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

In late 2002, Plaintiff, a Corporal in the Police Department, was elected as a union steward for the Carlisle Police Association ("the Union"), and appointed Union Treasurer in January 2003.  In connection with his duties as a Union Seward, Plaintiff participated in contract negotiations with Carlisle and met with Carlisle Borough Manager Fred Bean.  Plaintiff alleges that he was terminated because he spoke out about misconduct by fellow Carlisle officers that was not properly investigated by the Borough.  In August 2002, Lt. Walters's son, Matt Walters, was stopped for a traffic violation by Officer Brewbaker.  Upon recognizing the name, the trooper radioed Sgt. Dzenzinski for further instructions.  Sergeant Dzenzinski telephoned Lt. Walters and asked if Matt Walters should be issued a citation.  Plaintiff alleges that Lt. Walters directed Officer Brewbaker to forego a citation and to send Matt home.  (Pl. Ex. B.)  Sergeant Dzenzinski advised Officer Brewbaker to give Matt a warning, but later, deleted Matt Walter's name from the traffic stop entry.  (Id.)

Plaintiff alleges that in a separate incident occurring in December 2002, Sgt. Guido drove his motor vehicle through several individuals' yards following a private party.  Plaintiff asserts that Sgt. Guido appeared drunk in public and authorized the use of police equipment at the party.  Plaintiff further alleges that on an unspecified date, Det. Smith trapped a woman in her apartment and threatened her with his firearm.  Plaintiff alleges that Det. Smith failed to report to a scene of a burglary and then falsified police records to indicate that he was on the scene.  In each case, Plaintiff claims that he reported the incidents to his superiors, but the Police Department failed to properly investigate.  (Doc. No. 36 at 17.)  Defendants contend that each incident has been fully investigated and, if found true, has been addressed.  (Doc. No. 32, ¶¶ 81-85.)

2

In early February of 2003, Plaintiff had an argument with Sgt. Guido in the communications room of the Police Department.  (Doc. No. 36 at 10.)  As characterized by Plaintiff, the argument began when Plaintiff told Sgt. Guido that "making the detectives accountable would be difficult because of the close friendship between Lt. Barry Walters and some of the detectives."  (Id.)  Sergeant Guido responded that detectives who refused to obey orders given to them by either Plaintiff or himself could face discipline.  (Id.)  Plaintiff "became frustrated" by this statement and responded in a loud voice, "Who the hell are you trying to kid, I tell you that [Det. Smith] put a gun to Jill's head and no one is doing a thing about it and you expect us to keep the other detectives in line. . . . [Y]ou know the things I reported to you about [Det. Smith], the gun ordeal, his padding his hours and money missing from the evidence locker."  (Id.)  Officer John Haggerty and a civilian dispatcher were present during the argument.[2]

Sergeant Guido immediately stopped the conversation and called Plaintiff into his office. Sergeant Guido admonished Plaintiff to refrain from making allegations of misconduct in the presence of subordinate officers.  Sergeant Guido advised that he would discuss Plaintiff's concerns with the Chief Margeson, and thereafter, Sgt. Guido met with Chief Margeson to address the allegations.  Subsequently, Plaintiff was instructed to submit a report outlining the allegations that he raised in the communications room.  In response to Plaintiff's report, Chief Margeson directed Lt. Pfahl to investigate the allegations against Det. Smith.  (Doc. No. 32, ¶ 28.)  Lieutenant Pfahl determined that the allegations that Det. Smith pointed a gun at the head

---

[2] The rank of Corporal is inferior to the rank of Sergeant, but superior to the ranks of Detective, Trooper, and other junior officers.  The rank of Lieutenant is superior to both Sergeant and Corporal, but serves under the Chief of Police.

of a woman were false.  (Def. Ex. G; Pl. Ex. A at 211-212.)  Further, Lt. Walters reported that the allegations raised regarding Det. Smith stealing from the evidence locker had previously been investigated and found to be false.  (Def. Ex. I.)

On March 28, 2003, Chief Margeson advised Plaintiff that he was under investigation for possible misconduct resulting from the allegations he made in the police communications room. By letter dated April 24, 2003, Chief Margeson advised Plaintiff that the investigation found that Plaintiff had engaged in misconduct.  Specifically, Chief Margeson determined that Plaintiff had violated the chain of command by making criminal and misconduct allegations against Det. Smith, and accusing the Chief of Police and Lt. Walters of complicity in Det. Smith's actions, to subordinate officers.  (Def. Ex. J.)  Chief Margeson recommended to Mayor Wilson that Plaintiff be demoted and receive a three day suspension without pay.  (Id.)  Chief Margeson further advised Plaintiff that repetition of this behavior would result in dismissal.  (Id.)

On April 27, 2003, Plaintiff attended a union meeting wherein he requested financial support from the members to defend against the pending demotion.  After the meeting, several union members approached Plaintiff and indicated that they could not support him unless he told them why he was facing disciplinary action.  (Pl. Ex. H at 57-61.)  Plaintiff told the officers about Det. Smith's alleged altering of police logs, Sgt. Guido's alleged public drunkenness, and the deletion of Matthew Walters's name from police records.  (Doc. No. 36 at 16.)  Plaintiff further stated that he reported each of these incidents to his superiors but the allegations had not been properly investigated and/or were covered up by his superiors.   (Def. Ex. K at 141, 144; Doc. No. 36 at 17.)

One of the officers who talked with Plaintiff after the union meeting reported Plaintiff's

second allegations to Lt. Walters, who in turn reported the statements to Chief Margeson.  (Def. Ex. K at 145-146.)  On March 5, 2003, Chief Margeson advised Plaintiff that he was being investigated for further possible misconduct based on the allegations made after the union meeting.  By letter dated May 6, 2003, Chief Margeson notified Plaintiff that the investigations had determined that Plaintiff engaged in Conduct Unbecoming an Officer and Disobedience of Orders by ignoring orders and repeating allegations of misconduct to junior officers.  (Def. Ex. L.)  As a result of these findings, Chief Margeson recommended to Mayor Wilson that Plaintiff be dismissed from the Police Department.  (Id.)  The Police Chief and the Mayor met with the Borough Council regarding Plaintiff's alleged conduct and on May 9, 2003, the Carlisle Borough Council officially terminated Plaintiff's employment.  (Def. Ex. M.)

Subsequently, Plaintiff timely appealed his termination to the Civil Service Commission ("Commission").  (Def. Ex. N.)  Joseph Rudolf, Esq., was hired to advise the Commission on procedure.  The Commission heard testimony and accepted evidence into the record during six-days of hearings.  Despite Plaintiff's objections, the Commission conducted the hearing during executive sessions, which are closed to the public.  On March 1, 2004, the Commission issued an order upholding Plaintiff's termination.  (Def. Ex. P.)

On March 29, 2004, Plaintiff appealed the Commission's ruling to the Court of Common Pleas of Cumberland County, Pennsylvania.  (Def. Ex. T.)  In his appeal, Plaintiff alleged that his termination violated his constitutional right to due process, freedom of speech, and freedom of association.  (Id.)  By Order dated February 11, 2005, the Court of Common Pleas found that the Commission did not violate Plaintiff's constitutional rights and that his termination was supported by substantial evidence.  (Def. Ex. U.)  On March 14, 2005, Plaintiff filed an appeal to

5

the Commonwealth Court of Pennsylvania.  (Def. Ex. X.)  Plaintiff's appeal remains pending.

Plaintiff filed a complaint in this Court on May 4, 2004.  (Doc. No. 1.)  On August 9, 2004, Defendants moved to dismiss the Amended Complaint.  (Doc. No. 10.)  By Order dated December 16, 2004, the Court granted the motion regarding the defamation claim against the Borough of Carlisle, but denied the motion in all other respects.  (Doc. No. 24.)  Subsequently, Defendants filed the instant Motion for Summary Judgment.  (Doc. No. 30.)  Defendants also filed a Motion to Strike Plaintiff's Concise Statement of Facts for failure to comply with Local Rule 56.1 (Doc. No. 42) and three motions in limine (Doc. Nos. 46, 48 and 50).

In connection with Plaintiff's claim of defamation, on September 23, 2003, <u>The Patriot-News</u> reported on Plaintiff's allegations of misconduct by Carlisle officers.  (Def. Ex. R.)  The article quoting Mayor Wilson as stating that Plaintiff's allegations were "groundless".  (<u>Id.</u>)  On May 19, 2004, <u>The Sentinel</u> newspaper reported on Plaintiff's civil action in this Court and quoted Mayor Wilson as stating that Plaintiff was a "disgruntled former employee".  (Def. Ex. Q.)  Plaintiff claims that these statements and letters written by Chief Margeson "contained known false statements calculated to place [Plaintiff] in a false light and to encourage others to take actions against [Plaintiff]."  (Doc. No. 1 ¶ 163.)

## II.   <u>Summary Judgment Standard</u>

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56; <u>White v. Westinghouse Elec. Co.</u>, 862 F.2d 56, 59 (3d Cir. 1988).  A factual dispute is material if it might affect the outcome of the suit under the applicable

law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is genuine

only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a

verdict for the non-moving party.  Id. at 249.  The evidence presented must be viewed in the

light most favorable to the non-moving party.  Id.  "The inquiry is whether the evidence presents

a sufficient disagreement to require submission to the jury or whether it is so one sided that one

party must, as a matter of law, prevail over the other."  Id.  This standard does not change by

virtue of cross-motions being presented.  United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa.

1990).

     The moving party has the initial burden of identifying evidence that it believes shows an

absence of a genuine issue of material fact.  Childers v. Joseph, 842 F.2d 689, 694 (3d Cir.

1988).  Once the moving party has shown that there is an absence of evidence to support the

non-moving party's claims, the non-moving party may not simply sit back and rest on the

allegations in the complaint.  Instead, the non-moving party must "go beyond the pleadings and

by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

designate specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett,

477 U.S. 317, 324 (1986).  The evidence must be viewed in the light most favorable to the

non-movant. See Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

Summary judgment should be granted where a party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case and on which that party will

bear the burden at trial." Celotex, 477 U.S. at 322.

     With respect to the sufficiency of the evidence that the nonmoving party must provide, a

court should grant summary judgment where the nonmovant's evidence is merely colorable,

conclusory or speculative.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

There must be more than a scintilla of evidence supporting the nonmoving part and more than

some metaphysical doubt as to the material facts.  Id. at 252; Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.   Discussion

Plaintiff alleges that he was unlawfully terminated from employment due to statements

he made about police misconduct and due to his union participation, in violation of the First

Amendment's protection of expression and association, respectively.  Plaintiff also asserts

violations of his procedural and substantive due process rights, and a claim of defamation.  The

Court will address each claim in turn.

### A.   First Amendment Freedom of Expression

Public employees have a First Amendment right to speak freely on matters of public

concern.  Rankin v. McPherson, 483 U.S. 378, 383-84 (1987); Baldassare v. New Jersey, 250

F.3d 188, 194 (3d Cir. 2001).  This protection only extends to speech regarding matters of public

concern, and must be balanced against the efficient operation of the workplace.  Connick v.

Myers, 461 U.S. 138, 146 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).  At the

same time, the Government has an interest in regulating the speech of its employees to promote

"efficiency and integrity in the discharge of official duties, and [in maintaining] proper discipline

in the public service."  Connick, 461 U.S. at 150-51.  These interests must be balanced against

the employee's interest in addressing matters of public concern and enabling the electorate to

make informed decisions.  Pickering, 391 U.S. at 572.

Under the Pickering analysis, a public employee must establish three elements to state a

retaliation claim under the First Amendment: (1) that the speech involved a matter of public concern; (2) that his or her interest in the speech outweighed the government employer's countervailing interest in providing efficient and effective services to the public; and (3) that the speech was a substantial or motivating factor in the alleged retaliatory action. Brennan v. Norton, 350 F.3d 399, 412- 414 (3d Cir. 2003). As a defense, the employer may show that it would have taken the adverse action even if the employee had not engaged in protected conduct. Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996). The employer's defense and the third factor are questions of fact; however, the first two factors are questions of law. Baldassare, 250 F.3d at 195.

On May 30, 2006, after this matter was fully briefed, the United States Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 126 S. Ct. 1951, 1960 (2006). The Court found that "Government employers, like private employers, need a significant degree of control over their employees' words and actions[,]" and therefore, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." Id. at 1958, 1961. Accordingly, courts now have an additional consideration when reviewing a First Amendment retaliation claim under the Pickering analysis. If the alleged protected speech involves a matter of public concern, the court must next determine if the employee was speaking as part of his or her official duties or instead as a citizen. Id. If the former, the speech is not protected under the First Amendment. If the latter, the Court must then determine whether the employee's interest in the speech outweighs

the government's countervailing interest in providing efficient and effective services to the public.

1.     Public Concern

In determining whether an employee's speech addresses matters of public concern, courts must review the content, form, and context of the speech.  Green v. Philadelphia Hous. Auth., 105 F.3d 882, 886 (3d Cir. 1997).  A public employee's speech involves a matter of public concern if it can "'be fairly considered as relating to any matter of political, social, or other concern to the community.'"  Green, 105 F.3d at 886 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

The speech for which Plaintiff was reprimanded and ultimately terminated involves statements made by Plaintiff in the communications room of the Police Department in February 2003 and statements he made after the April 27, 2003 union meeting.  Although the parties dispute the exact content of the speech and the truthfulness of Plaintiff's accusations, the parties agree that Plaintiff accused Carlisle officers of very serious misconduct and accused senior officers of inadequately investigating the offenses.  (Doc. Nos. 31 at 12-13; 37 at 6.)  Specifically, Plaintiff accused fellow officers of deleting police records, falsifying police logs, public drunkenness, misappropriation of equipment, theft of evidence, and assault.  (Doc. No. 37 at 6.)  Although Defendants argue that these statements were made by Plaintiff merely for personal reasons and not in an attempt to expose misconduct within the Carlisle Police Department, Plaintiff's motives do not negate the import of the content of the statements.  "The private nature of the statement does not . . . vitiate the status of the statement as addressing a

matter of public concern." Rankin v. McPherson, 483 U.S. 378, 387 n.11 (1987); see also

O'Donnell v. Yanchulis, 875 F.2d 1059, 1061 (3d Cir. 1989) ("Needless to say, allegations of

corrupt practices by government officials are of the utmost public concern").  Plaintiff's

statements represent serious allegations of misconduct and mismanagement within the  Police

Department and touch upon matters of great importance to the public.  Accordingly, the Court

finds that, as a matter of law, Plaintiff's speech relates to matters of public concern for the

purposes of Pickering.

2.      Whether Plaintiff Spoke as part of his Official Duties

After Garcetti, this Court must also inquire as to whether the statements for which

Plaintiff seeks protection were made as part of his official duties.  The subject matter and place

of the expressions are not dispositive.  Garcetti, 126 S. Ct. at 1959.  Rather, the controlling factor

is whether the statements were made pursuant to Plaintiff's duties as Corporal.  Id.  Although the

record indicates that Plaintiff had supervisory responsibility over junior officers, and it may be

inferred that he had a duty to report disciplinary problems to his superiors, Plaintiff has not

alleged that he was duty-bound to report or investigate infractions by those persons who were the

subject of his statements.  The factual background of Plaintiff's initial complaint regarding

misconduct by fellow officers does not support a finding that Plaintiff acted within the course of

his official duties in making his complaint.  The February 2003 outburst in the communications

room was made during an argument Plaintiff had with his superior.  The April 2003 statements

were made by Plaintiff in order to secure financial assistance from fellow union members in

defending a disciplinary action.  Viewing the record in a light most favorable to non-moving

Plaintiff, the Court does not find, as a matter of law, that the statements were made pursuant to

11

Plaintiff's duties as Corporal.  Therefore, the Court must balance Plaintiff's interests, as a citizen, in making the statements against the Government's interest, as employer, in promoting the efficiency of the public services.  Pickering, 391 U.S. at 568.

       3.    Balance of Interests

The third Pickering prong requires "a fact-sensitive and deferential weighing of the government's legitimate interests" in regulating a public employee's speech.  Bd. of County Comm'r v. Umbehr, 518 U.S. 668, 677 (1996); see also Swartzwelder v. McNeilly, 297 F.3d 228, 235 (3d Cir. 2002).  "Public employees . . . often occupy trusted positions in society.  When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions."  Garcetti, 126 S. Ct. at 1958.  Therefore, courts must strike a balance between the interests of the public employee, as a citizen, in commenting upon matters of public concern, and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.  Pickering, 391 U.S. at 568. If Plaintiff cannot establish that his interest outweighs Carlisle's countervailing interest, Plaintiff's First Amendment retaliation claim must fail as a matter of law.  Baldassare, 250 F.3d at 195.

When balancing these interests, courts give law enforcement agencies wide latitude to regulate an employee's speech when that speech impacts on areas such as discipline, morale, harmony, uniformity, and trust in the ranks.  See Kelley v. Johnson, 425 U.S. 238, 246 (1976) (noting that police departments need significant flexibility to make decisions that affect "discipline, esprit de corps, and uniformity"); Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) (recognizing the "heightened need for order, loyalty, morale, and

harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers"); Campbell v. Towse, 99 F.3d 820, 829-30 (7th Cir. 1996) (noting the special need of law enforcement superiors to be assured that their subordinates will be loyal and will carry out orders); Moore v. Wynnewood, 57 F.3d 924, 934 (10th Cir. 1995) (finding "heightened interest" in maintaining discipline and harmony in context of law enforcement). O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998) (stating that due to the "special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating speech of police officers than in regulating the speech of other governmental employees").  Governmental interests underlying the regulation of employee speech may include "whether the statement impairs discipline by supervisors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Swartzwelder, 297 F.3d at 235  (citing Rankin v. McPherson, 483 U.S. 378, 388 (1987)); see also Watters v. City of Philadelphia, 55 F.3d 886, 897 (3d Cir. 1995).  The Government need not demonstrate that the speech actually disrupted the organization's operation, however "disruption caused by actions independent of the speech at issue cannot be equated with disruption caused by the speech itself." Watters, 55 F.3d at 896-97. The Court must also take into account the employee's authority and position within the organization.  Rankin, 483 U.S. at 390.

Balancing the parties' interests under Pickering and its progeny, the Court finds, as a matter of law, that the balance of interest in this case favors the Borough of Carlisle.  Plaintiff did not simply speak about suspected misconduct; he chose to speak to officers of lower rank

13

and outside the chain of command, in direct violation of an order to refrain from doing so.

Moreover, the record does demonstrate that Plaintiff's open accusations negatively affected the

discipline and trust of his fellow officers.  (Def. Exs. C at 31-32; D at 46-47; E at 69; K at 144-

45; Y at 222-30.)  The civilian dispatcher testified at the civil service hearing that Plaintiff's

February 2003 statements made her question her trust in the Chief of Police.  (Def. Ex. D at 46-

47.)  One of the junior officers who conversed with Plaintiff after the April 27, 2003 union

meeting testified that Plaintiff's remarks made him call into question the integrity of Chief

Margeson and Lt. Walters.  (Def. K at 144-45.)  The officer also testified that he repeated

Plaintiff's statements to others.  (Id. at 145.)  As a Corporal in the police department, Plaintiff's

statements would have added weight with the junior officers and civilian dispatcher.  Chief

Margeson testified that because Plaintiff made the statements to junior officers relatively new to

the force, his statements "serve[d] to erode any type of trust, confidence in the officers,

supervisors and command staff."  (Def. Ex. Y at 230.)  The record also indicates that even senior

officers were affected by Plaintiff's accusations.  Sergeant Guido testified that he took Plaintiff's

February 2003 statements that the Chief Margeson covered up Det. Smith's misconduct very

seriously and stated that if Plaintiff's statements were accurate, he could not work under Chief

Margeson's command.  (Def. Ex. E at 69.)

　　　　Under Pickering, the balance of interests in the instant case favors Defendants.

Pickering, 391 U.S. at 568.  The need to enforce compliance with police regulations concerning

the proper manner to report misconduct outweighs Plaintiff's interest in openly discussing the

matters with fellow officers, outside of the chain of command.  Plaintiff fails to satisfy the

second prong of a First Amendment retaliation claim.  Accordingly, Defendants' motion for

summary judgment on the First Amendment freedom of expression claim will be granted.

## B.   First Amendment Freedom of Association

The United States Constitution protects two types of association:  intimate association and expressive association.  Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 438 (3d Cir. 2000) (citing Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984)).  The first type protects certain close and intimate human relationships, such as family relationships. Id. at 441-42.  The second type of association protects the rights of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances . . . ." Roberts, 468 U.S. at 622 (citations omitted) ("According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority").  The parties agree that union activities constitute expressive association.  (Doc. Nos. 31 at 11; 37 at 12.)

It is well established that the First Amendment right of association guarantees the right to join a union and to advocate in favor of unionization.  Thomas v. Collins, 323 U.S. 516, 532 (1945).  Therefore, in order to succeed on a claim of retaliation for engaging in a protected union activity, Plaintiff must demonstrate that his union membership was a "substantial" or "motivating factor" in Defendants' termination decision.  Brennan, 350 F.3d at 412; Baldassare v. State of New Jersey, 250 F.3d 188, 194-95 (3d Cir. 2001); see supra § III(a) pp. 8-9. Temporal proximity of the activity to termination may be used to show causation, however, the timing must be "unusually suggestive of retaliatory motive before a causal link will be inferred." Shellenberger v. Summit Bancorp, Inc. 318 F.3d 183, 189 n.9 (3d Cir. 2003) (internal citation

omitted).  The public employer can refute the claim by showing that it would have taken the same action even in the absence of the protected speech.  Id.

Plaintiff argues that because his termination is based upon statements made to union members immediately after a union meeting, Plaintiff was terminated due to union activities in violation of his right to freedom of association.  (Doc. No. 37 at 13-14.)  For the reasons discussed more fully above, Plaintiff's April 27, 2003 statements are not protected speech. When Plaintiff made the statements on April 27, 2003, he already faced an upcoming disciplinary hearing for making similar statements in the police communications room.  Chief Margeson's April 24, 2003 order did not prohibit Plaintiff from attending union meetings or fulfilling his duty as Union Treasurer.  Plaintiff points to nothing in the record supporting a finding that the locus of Plaintiff's statements or Plaintiff's leadership in the union was a motivating factor in his dismissal.  Plaintiff proffers nothing to suggest that Defendants possessed an anti-union animus or sought to punish Plaintiff because of his union activities. Based upon the record before the Court, no reasonable fact finder could conclude that Plaintiff was terminated due to his association with the Union.  Accordingly, this claim will be dismissed.

### C.      Procedural Due Process

Plaintiff alleges that he was deprived of property rights in his employment without procedural due process.  An essential principle of due process is that a "deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  Cleveland Bd. of Education v. Loudermill, 470 U.S. 532, 542 (1985) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)).  However, "due process is not a technical conception with a fixed content unrelated to time, place, and

circumstances[,]" rather it "is flexible and calls for such procedural protections as the particular situation demands." Gilbert v. Homar, 520 U.S. 924, 930 (1997) (internal citations removed). In order to establish a procedural due process violation, a plaintiff must establish that the municipality deprived him of a protected property interest and that the state procedures for challenging the deprivation do not provide sufficient procedural due process. Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 682 (3d Cir. 1991), abrogated on other grounds by United Artists, 316 F.3d 392 (3d Cir. 2003). Defendants concede that Plaintiff, as a police officer, had a property interest in his employment under Pennsylvania law and was terminated from that position on May 9, 2003. (Doc. No. 31 at 14.) Therefore, the Court will address whether the municipal and state procedures provided to Plaintiff prior to and after his termination were adequate, as a matter of law, to protect his procedural due process rights.

The undisputed record demonstrates that Plaintiff was provided notice of the charges against him, a termination hearing before the Borough Council, a six-day post-termination civil service hearing, and the availability of a review process in the state courts. After receiving an unfavorable decision from the Borough Civil Service Commission, Plaintiff appealed his termination to the Court of Common Pleas of Cumberland County, Pennsylvania (Def. Ex. U), and thereafter to the Commonwealth Court of Pennsylvania (Def. Ex. X) where his appeal is ongoing. Plaintiff argues that he did not receive proper procedural due process during the civil service hearing because the Commission's legal advisor had a prior relationship with Carlisle. Pursuant to the Borough of Carlisle Civil Service Rules and regulations, "'[t]he Commission may employ legal counsel to advise it on matters arising at hearings.'" (Doc. No. 37 at 20)(quoting Rule 908.) Plaintiff alleges that Carlisle, and particularly Borough Manager Bean,

chose an attorney, Joe Rudolf, Esq., who had formerly represented Carlisle to advise the Civil

Service Commission and "steer the Commission to rule in favor of the Defendants prior to and

during the hearing on all issues of fact and law . . . ."  (Doc. No. 37.)  Plaintiff also alleges that

manager Bean and Chief Margeson had several improper ex parte communications with

Attorney Rudolph.  (Doc. No. 54, ¶ 72.)

      "It is well established that 'due process demands impartiality on the part of those who

function in judicial or quasi-judicial capacities.'"  <u>Abdulrahman v. Ashcroft</u>, 330 F.3d 587 (3d

Cir. 2003) (quoting <u>Schweiker v. McClure</u>, 456 U.S. 188, 195 (1982)).  However, there is a

strong presumption of impartiality, which is not lightly rebutted, and only in "the most extreme

of cases" can it be overcome.  <u>Aetna Life Ins. Co. v. Lavoie</u>, 475 U.S. 813, 821 (1986); <u>see also</u>

<u>Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975) (claim of due process violation because State

Examining Board had both investigative and adjudicative functions carries "a much more

difficult burden of persuasion" and a plaintiff "must overcome a presumption of honesty and

integrity in those serving as adjudicators"); <u>United States v. Morgan</u>, 313 U.S. 409, 421 (1941)

(without a showing to the contrary, state administrators "are assumed to be [people] of

conscience and intellectual discipline, capable of judging a particular controversy fairly on the

basis of its own circumstances").  The Court must presume that the commissioners are not

biased, and it is the Plaintiff's burden to establish a "conflict of interest or some other specific

reason for disqualification."  <u>Schweiker</u>, 456 U.S. at 195.

      Contrary to Plaintiff's assertion that the mere appearance of partiality in an

administrative context is a due process violation, federal courts have consistently found a much

higher standard.[3]  For instance, courts have held that a board is not <u>per</u> <u>se</u> biased simply because it investigated and adjudicated the same case.  <u>See</u>, <u>e.g.</u>, <u>Withrow</u>, 421 U.S. at 58 (State Examining Board's ability to suspend physician's license, initiate, investigate and adjudicate charges against physician does not constitute denial of due process absent demonstration of actual bias or risk of bias); <u>Matter of Seidman</u>, 37 F.3d 911, 926 (3d Cir. 1994) (Director of Office of Thrift Supervision's ability to authorize investigation, determine whether charges should be brought, issue notice of charges, and to decide charges as to law and fact does not constitute denial of due process absent showing of actual bias or risk of bias).  Adjudicators enjoy a presumption of honesty and integrity, and "the mere exposure to [other] evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members . . . ." <u>Withrow</u>, 421 U.S. at 47, 55.

In support of his procedural due process claim, Plaintiffs relies heavily on the Pennsylvania Supreme Court's holding in <u>Lyness v. Commonwealth of Pennsylvania</u>, 605 A.2d 1204 (Pa. 1992).  In <u>Lyness</u>, the Court held that the revocation of a medical doctor's license violated his due process rights under the Pennsylvania Constitution when the State Board of Medicine both initiated the investigation against the doctor and later acted as the ultimate fact finder in the disciplinary action.  In so finding, the Court noted that "even an appearance of bias and partiality must be viewed with deep skepticism, in a system which guarantees due process to

---

[3] Plaintiff's reliance on provisions of the Code of Judicial Conduct and 28 U.S.C. § 455, which concerns the disqualification of <u>federal</u> judges, is misguided and of no moment to the instant matter.

each citizen." [4]  <u>Lyness</u>, 605 A.2d at 1207.  However, <u>Lyness</u> is inapposite.  In contrast to <u>Lyness</u>

and the cases discussed therein, the case <u>sub</u> <u>judice</u> does not involve a situation wherein charges

were initiated by an individual or multi-member entity that later acted as the ultimate fact finder

against the charged individual.  Moreover, <u>Lyness</u> was decided under Pennsylvania's

Constitution, not the United States Constitution.  <u>Lyness</u>, 605 A.2d at 1207

The due process clause of the United States Constitution does not prohibit an administrative

board from combining investigative and adjudicative functions.  <u>Withrow</u>, 421 U.S. 35, 55

(1975); <u>Subramanian v. Falls Township</u>, 1994 U.S. Dist. LEXIS 9903 (E.D. Pa. 1994).

     In the case <u>sub</u> <u>judice</u>, Defendants proffer evidence that Attorney Rudolf was selected by

the chair of the Civil Service Commission, Ben Francavilla, because of Rudolf's expertise with

civil service rules and regulations, and through mutual association with the Pennsylvania League

of Cities and Municipalities. [5]  (Def. Ex. O at 120-25.)  Manager Bean testified at deposition that

the only conversations he had with Attorney Rudolf relating to Plaintiff involved scheduling the

hearings and Rudolph's attorney fees, which Carlisle was responsible to pay.  (<u>Id.</u> at 128-31,

138-39.)  Manager Bean also testified that he sent a letter to Attorney Rudolph expressing the

Borough Council's sensitivity to the appearance that Carlisle conducts public business behind

closed doors.  (<u>Id.</u> at 133-37.)  Police Chief Margeson testified that he met Attorney Rudolf at

the International Association of Chiefs of Police Conference in Philadelphia around the time of

---

     [4] In <u>Stone & Edwards Ins. Agency, Inc. v. Dep't of Ins.</u>, 648 A.2d 304, 307 (Pa. 1994),
the Pennsylvania Supreme Court clarified that "the form of impermissible 'appearance' of bias . .
. must clearly be one that arises from an actual environment of commingled functions."

     [5] By law and as a practical matter, the Commission must work closely with the Borough
of Carlisle.  53 Pa. Cons. Stat. Ann. §§ 46172, 46173, 46175.

the hearings, but did not discuss the case.  (Def. Ex. C at 45-46.)  Plaintiff proffers no evidence to suggest that anyone in the Police Department or with Carlisle discussed the merits of the hearings with Attorney Rudolf or the members of the Commission.

The record does not support the specter of bias that Plaintiff claims existed within the Commission's choice of advisory counsel or Attorney Rudolf's role during the hearings. Plaintiff points to no evidence, beyond bald allegations, demonstrating bias of the Commission or Attorney Rudolf, or improper ex parte communications concerning the substance of the case. Further, the transcript of the civil service hearing on record does not support a finding that Attorney Rudolf's participation in the hearing resulted in an unfair or impartial proceeding, or that Attorney Rudolf guided the Commission in reaching their decision.  The Plaintiff adduces no evidence to rebut the presumption of impartiality given to the Commission members in their adjudication of Plaintiff's case.  Withrow, 421 U.S. at 47, 55.

Similarly, the fact that the Commission chose to conduct the civil service hearings in executive session does not support Plaintiff's claim of a violation of procedural due process. The Borough Code, 53 Pa. Stat. Cons. Ann. § 46191, does not specify that Civil Service hearings must be open to the public.[6]  The hearings involved serious allegations of misconduct against multiple Carlisle police officers, which according to the Civil Service Commission's findings, turned out to be unsubstantiated.  The entirety of the hearings were transcribed and the Commission's findings have become public record.  (Pl. Ex. A; Def. Ex. P.)  Plaintiff fails to

---

[6] Plaintiff argued this precise issue before the Court of Common Pleas of Cumberland County, Pennsylvania, and the court found that the Commission's decision to hold Plaintiff's hearings in executive session did not violate Pennsylvania's Sunshine Act, 65 Pa. Stat. Conn. Ann. §§ 701-716.  (Def. Ex. U.)

identify how the executive session status detrimentally affected the process or hindered his ability to present his case before the Commission.[7]  Based upon the record evidence and as a matter of law, Plaintiff received all of the procedural due process due to him under the United States Constitution.  Accordingly, this claim will be dismissed.

### D.       Substantive Due Process

Plaintiff alleges that "Defendants' actions by selecting a specific attorney to steer the supposed independent hearing commission" violated Plaintiff's substantive due process rights under the Fourteenth Amendment.  (Doc. No. 6 ¶ 156.)  Substantive due process protects individuals from state and local government interference with certain constitutionally recognized fundamental rights.  Reno v. Flores, 507 U.S. 292, 301-02 (1993); Phillips v. Borough of Keyport, 107 F.3d 164, 180 (3d Cir. 1997).  The fundamental rights are those rights that are "deeply rooted in the Nation's history and traditions."  Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 143 (3d Cir. 2000).

Plaintiff fails to identify which right he claims was deprived.  In his Amended Complaint, Plaintiff asserts that "Defendant had an affirmative duty to Plaintiff to insure that his rights to due process were not hindered" and Defendants' failure in that regard "shocks the conscience."

---

[7] Moreover, a constitutional violation actionable under section 1983 "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."  Zinermon v. Burch, 494 U.S. 113, 126 (1990).  Therefore, a cause of action for a due process violation does not accrue at Plaintiff's termination, rather it accrues when Plaintiff seeks to grieve his deprivation and is denied that opportunity.  See McDaniels v. Flick, 59 F.3d 446, 461 (3d Cir. 1995) (internal quotations removed) (finding that state court review of a termination is "sufficient process to protect [a public employee's] property rights"); Demko v. Luzerne County Cmty. Coll., 113 F. Supp. 2d 722, 737 (M.D. Pa. 2000) (finding that the availability of state court review of the College's actions in terminating an administrator, "whether or not [Plaintiff] made use of that review, satisfied the requirements of the due process clause").

(Doc. No. 6 at ¶¶ 156-158.)  In his brief in opposition to summary judgment, Plaintiff merely

lists alleged procedural defects with his civil service hearing and "the misleading conduct of the

Chief [of Police] and Mayor," arguing that "[l]ooking at the totality of the circumstances" these

activities shock the conscience.  (Doc. No. 37 at 23.)  Based upon the above, it appears that

Plaintiff is alleging deprivation of his property interest in his employment.  However, the

property interest Plaintiff had in his public employment is not an interest that is protected by the

Substantive Due Process Clause, rather it is merely a state-created contract right.  Nicholas, 227

F.3d at 143 (concluding that professor's tenured public employment was wholly state-created

contract right that was not a fundamental property interest for purposes of the Substantive Due

Process Clause).  Since Plaintiff fails to demonstrate deprivation of a constitutionally recognized

fundamental right, Plaintiff's substantive due process claim will be dismissed.

### E.   Defamation

In his Amended Complaint, Plaintiff claims that:

> The statements of Margeson and other Defendants to the members of the
> Borough's Council relating to [Plaintiff] and letters written by Margeson
> regarding [Plaintiff] and circulated to others, contained false
> statements calculated to place [Plaintiff] in a false light and to encourage
> others to take actions against [Plaintiff].

(Doc. No. 1 ¶ 163.)  Further, Plaintiff claims that Borough Manager Bean, Chief Margeson,

Mayor Wilson, and Lt. Walters conspired to defame him.  (Id. at 162.)  Plaintiff's Amended

Complaint does not identify the alleged defamatory statements, nor specify the content of these

"false statements".  (Doc. No. 1 ¶ 160-169.)  In his brief in opposition to summary judgment,

Plaintiff identifies, for the first time and without detail, four defamatory statements, which the

Court summarizes as follows:

1)      Chief Margeson's statement to other officers and the Borough Council that
        Plaintiff accused Lt. Walters of deleting official police records relating to his son
        and that this amounted to disobeying orders and conduct unbecoming an officer;

2)      Chief Margeson's statement to other officers and the Borough Council that the
        deletion of the records had been investigated and allegations of Lt. Walters's
        involvement are unfounded;

3)      Mayor Wilson's statement to the press that Plaintiff's allegations of misconduct
        had been investigated and were unfounded; and

4)      Mayor Wilson's statement to the press that Plaintiff was a "disgruntled
        employee".

(Doc. No. 37 at 29.)  Plaintiff further alleges that Lt. Pfahl, Mayor Wilson, and Borough

Manager Bean defamed Plaintiff by corroborating Chief Margeson's statements.  (Id.)  Although

Plaintiff does not point to any specific statement in the record, it appears from his brief in

opposition that Plaintiff's claim is based upon:  Chief Margeson's April 24, 2003 letter (Def. Ex.

J); Chief Margeson's May 6, 2003 letter (Def. Ex. L); Mayor Wilson's statements as reported by

The Patriot-News on September 23, 2003 (Def. Ex. R); Mayor Wilson's statements as reported

by The Sentinel on May 19, 2004 (Def. Ex. Q); and Defendants' testimony during Plaintiff's

termination hearing on May 8, 2003.

        Under Pennsylvania law, a defamatory statement is one that "'tends so to harm the

reputation of another as to lower him in the estimation of the community or to deter third persons

from associating or dealing with him.'"  U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,

898 F.2d 914, 923 (3d Cir. 1990) (quoting Birl v. Philadelphia Elec. Co., 167 A.2d 472, 475

(1960)).  To succeed on a defamation claim, the plaintiff must prove:

        1) the defamatory character of the communication; 2) its publication by
        the defendant; 3) its application to the plaintiff; 4) an understanding by
        the reader or listener of its defamatory meaning; and 5) an understanding
        by the reader or listener of an intent by the defendant that the statement

24

refer to the plaintiff.

Id. (citing 42 Pa. Cons. Stat. Ann. § 8343(a)(1)-(5)).  A publisher of a defamatory statement is

not liable if the publication was made subject to a privilege, and the privilege was not abused.

Chicarella v. Passant, 494 A.2d 1109, 1112-1113 (Pa. Super. Ct. 1985).  Even assuming

arguendo that the statements Plaintiff lists are defamatory in nature, each publication is subject

to a privilege under Pennsylvania law.

Under Pennsylvania common law, employers have "an absolute privilege to publish

defamatory matters in notices of dismissal or warning letters", so long as the publication is not

excessive.  Daywalt v. Montgomery Hosp., 573 A.2d 1116, 1118  (Pa. Super. Ct. 1990) (citing

Agriss v. Roadway Express, Inc., 483 A.2d 456, 464 (Pa. Super. Ct. 1984)).  Furthermore,

"publication is conditionally privileged if the publisher reasonably believes that the recipient

shares a common interest in the subject matter and is entitled to know.  This privilege applies to

private communications among employers regarding discharge and discipline."  Id. (internal

citations omitted).  Chief Margeson's letters dated April 24, 2003 and May, 26 2003 are

employment publications, informing Plaintiff of deficiencies in his conduct as a Corporal in the

police department and explaining the disciplinary procedures that would follow.  (Def. Exs. J

and L.)  The Court finds nothing in the record to indicate that these correspondences were

published beyond a few individuals entitled to know of the reprimand or that Chief Margeson

abused the privilege afforded to him as Plaintiff's supervisor.[8]  Accordingly, these publications

are privileged and defamation claims based upon statements therein cannot stand.

---

[8] The letters both indicate that Mayor Wilson, Borough Manager Bean, Lt. Pfahl, and Sgt. McCoy received a copy of each.  (Def. Exs. J and L.)

A hearing before a tribunal which performs a judicial function, "'including many administrative officers, boards and commissions, so far as they have the powers of discretion in applying the law to the facts'" are considered "quasi-judicial" and afforded the same absolute immunity as regular judicial proceedings.  Overall v. Univ. of Pa., 412 F.3d 492, 496 (3d Cir. 2005) (quoting Milliner v. Enck, 709 A.2d 417, 419 n.1 (Pa. Super. Ct. 1998)).  Both the May 8, 2003 termination hearing before the Carlisle Borough Council and the subsequent six-day Civil Service Commission hearing are quasi-judicial grievance proceedings before a government entity required by law to adjudicate such matters.  53 Pa. Cons. Stat. Ann. § 46121; 53 Pa. Cons. Stat. Ann. § 46191.  Accordingly, statements made within these proceedings are entitled to absolute immunity against defamation claims.  Overall, 412 F.3d at 497.  Defamation claims based upon statements made during and pursuant to these proceedings cannot stand.

Lastly, "high public officials" enjoy an absolute privilege against liability for making allegedly defamatory remarks within the scope of their authority.  Montgomery v. Philadelphia, 140 A.2d 100, 103 (Pa. 1958).  This privilege is limited to "'statements and actions which are in fact 'closely related' to the performance of [the high public official's] duties.'"  Mosley v. Observer Publishing Co., 619 A.2d 343, 346 (Pa. Super. Ct. 1993) (quoting McCormick v. Specter, 275 A.2d 688, 689 (1971)).  In Suppan v. Kratzer, 660 A.2d 226 (Pa. Commw. Ct. 1995), the Pennsylvania Commonwealth Court found that a mayor and borough council president were "high public officials" entitled to absolute privilege regarding allegedly defamatory comments about the qualifications of an individual applying for employment with the borough police department.  Suppan, 660 A.2d at 230.  As Mayor of Carlisle, Kirk Wilson falls within the description of "high public official" under Pennsylvania defamation law.  Id.

26

Mayor Wilson's comments to the press regarding Plaintiff's allegations of police misconduct were made in his capacity as mayor, and within his duty to supervise the Carlisle Police Department and speak on behalf of the borough on matters of public concern.  53 Pa. Cons. Stat. Ann.§ 46029.  Accordingly, Mayor Wilson enjoys absolute privilege against liability for making the above alleged defamatory statements.  As each of Plaintiff's claims of defamation are barred under Pennsylvania law, the claims must be dismissed.[9]

---

[9] As the Court finds, as a matter of law, that each of Plaintiff's claims of defamation are barred by privilege, Plaintiff's conspiracy to defame claim must also fail, as no underlying tort survives to support the conspiracy.  Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 405-406 (3d Cir. 2000) (finding that "a claim of civil conspiracy cannot be pled without alleging an underlying tort").

**IV.**     <u>**Order**</u>

AND NOW, on this 10th day of July, 2006, **IT IS HEREBY ORDERED THAT**

Defendants' Motion for Summary Judgment is **GRANTED**.  The Clerk of Court is directed to

**ENTER JUDGMENT IN FAVOR** of all Defendants and **AGAINST** Plaintiff on all counts of

the Amended Complaint. (Doc. No. 6.)  Defendants' Motion to Strike Plaintiff's Concise

Statement of Facts is **DENIED**. (Doc. No. 42.)  Defendants' Motions in Limine are **DENIED** as

moot.  (Doc. Nos. 46, 48, and 50.)  The Clerk of Court is directed to close the file.


       S/ Yvette Kane
       Yvette Kane
       United States District Judge

Dated: July 10, 2006